NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0463n.06

Nos. 15-4180/4181

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Aug 11, 2016
DEBORAH S. HUNT, Clerk

MARK A. CRAWFORD,
BRENDON M. REED, DEBRA
ORNELAS,

     Plaintiffs-Appellees,

v.

DONAVIN L. GEIGER, ET AL.

     Defendants,

and

NICHOLAS HART, JESSE
EVILSIZER,

     Defendants-Appellants.

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO

BEFORE:    KEITH, CLAY, and WHITE, Circuit Judges.

    **CLAY, Circuit Judge.** In 2013, plaintiffs-appellees Mark Crawford, Debra Ornelas, and Brendon Reed (collectively, "Plaintiffs") filed a civil rights lawsuit against defendants-appellants Nicholas Hart and Jesse Evilsizer—two police officers—and several other officers who had responded to a 911 call placed by Ornelas. The officers moved for summary judgment on qualified immunity grounds, which the district court granted as to some officers. Relevant to this appeal, the district court rejected Hart's and Evilsizer's qualified immunity claims. For the following reasons, we **REVERSE** the district court's denial of qualified immunity as to Evilsizer and **AFFIRM** the district court's denial of qualified immunity as to Hart.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

At approximately 9:00 pm on August 26, 2012, plaintiff Mark Crawford received a phone call from his mother, Jane Crawford, informing him that she and her daughter (also Crawford's sister), plaintiff Debra Ornelas, had heard what sounded like a break-in at the family's furniture store, Crawford's Furniture. Ms. Crawford asked her son to come investigate the noise immediately.

After hanging up, Crawford told his nephew, plaintiff Brendon Reed (also Ornelas' son and Ms. Crawford's grandson), that Ms. Crawford believed someone was breaking into one of the furniture store's warehouses and had asked Crawford and Reed to "get there right now." Crawford then proceeded to retrieve ammunition, a Colt .45 pistol, and shotgun. Thereafter, he and Reed—who was armed with an AR-15 rifle—climbed into Reed's Dodge pickup truck. With Reed driving, it took the two men approximately a minute to a minute-and-a-half to travel between Crawford's house and Ms. Crawford's property, where Crawford's Furniture was located.

Meanwhile, after she and Ms. Crawford heard what sounded like noise from a break-in, Ornelas drove her vehicle behind the Crawford's Furniture warehouses to investigate. At the same time, Ornelas was on her cell phone with her daughter-in-law (also Reed's wife), Christine Reed. Although Ornelas knew that her mother was planning to call Crawford, she instructed Christine to call 911. Shortly after Ornelas hung up with Christine, an Allen County, Ohio dispatcher called Ornelas to follow-up on the 911 call Christine had placed. The dispatcher informed Ornelas that police officers were en route to Crawford's Furniture and remained on the line with Ornelas until she saw an officer and his canine partner on the property. Ornelas later

learned that this particular police officer was defendant Donavin Geiger, a deputy with the Allen County Sheriff's Department.

Deputy Geiger approached Ornelas, who was still seated in her vehicle, and told her to go back to Ms. Crawford's house. Ornelas complied, parking her vehicle near the patio adjacent to the house; meanwhile, Geiger proceeded to approach the warehouses from the north.

When they reached Crawford's Furniture, Reed parked his truck approximately 30 feet from Ms. Crawford's house, and Crawford jumped out of the truck to retrieve his pistol and ammunition. After Crawford re-entered the truck, the two men proceeded to "speed load" the pistol, the rifle, and the shotgun, then drive toward the warehouses "dynamically," i.e., loudly and with the truck's bright headlights turned on. At this time, they had no idea that Ornelas had called 911 or that Geiger, a police officer, was searching the premises.

As Reed was turning left to "do a sweep behind the warehouses," he saw a bright light and stopped the truck. Reed and Crawford then exited the truck to "cover [the] perceived threat"—Reed armed with his rifle and Crawford holding his shotgun and wearing the pistol holstered on his left side.

The parties' accounts of what occurred next diverge considerably. According to Plaintiffs, after Reed parked the truck, he and Crawford assumed a "triangle" formation in relation to the person shining the bright light—who they later learned was Deputy Geiger—with their firearms trained on the light source. Crawford announced, "Mark A. Crawford, identify yourself, you're trespassing on private property." (R. 69-4, PageID# 1145; R. 69-6, PageID# 1335). Crawford continued to identify himself by name and as the property owner,[1] and both he and Reed told Geiger "identify yourself" several times. According to Plaintiffs, Geiger never

---

[1] Although not entirely clear from the record, it appears that Ms. Crawford owned the property, while Crawford and his siblings were heirs to the property.

identified himself (by name or as a police officer), but instead trained his very bright flashlight on Crawford and Reed and shouted, "put [y]our guns down" and "get on the fucking ground." (*See* R. 69-4, PageID# 1140, 1142, 1146; 69-6, PageID# 1328, 1334–36, 1342–44). This "standoff" continued for approximately 15 to 40 seconds. At their respective depositions, both Crawford and Reed testified that they refused to obey Geiger's commands to drop their weapons and get on the ground because they could not see him in the dark, did not realize he was a police officer (at in least in part due to his refusal to identify himself), and perceived him as an "unknown threat."

About 30 to 40 seconds into the standoff, Crawford heard radio traffic, a sound with which he was familiar based on his prior employment in the military and as a corrections officer. Upon hearing the radio traffic, Crawford "took a leap of faith," assumed the person shining the bright light in his direction was a law enforcement officer, and put his shotgun on the ground. Crawford also instructed Reed to drop his rifle and step away from the weapon. Reed complied. Crawford raised his hands in the "surrender position," but never reached for or removed the pistol on his belt because Geiger did not specifically instruct him to drop this second firearm and "anybody knows you don't touch a pistol locked down in your holster if your hands are up[.]" (*See* R. 69-6, PageID# 1346, 1350–51, 1353).

While talking to Ms. Crawford in front of the house, Ornelas overheard at least part of the standoff between Geiger, Crawford, and Reed. The "first audible thing" Ornelas heard was Geiger "saying that he was going to shoot somebody in the fucking head." (R. 69-7, PageID# 1766). "[D]irectly after that," she heard her brother say, "Mark A. Crawford, property owner." (*Id.*). Although she could discern some of what was being said during this confrontation,

Ornelas did not "understand what all the yelling was about," and assumed that Geiger had mistaken Crawford and Reed for "the people breaking into the warehouse." (*Id.* at 1766–67).

Hoping to dispel any misunderstanding, Ornelas hurried over to the warehouses. There, she saw Crawford and Reed standing next to the driver's side of Reed's truck. Initially, Ornelas tried to explain to Deputy Geiger that Crawford was the property owner, Reed was her son, and that she herself had called 911. However, when the yelling between Geiger and Crawford continued and no one appeared to be listening to her, Ornelas approached Reed to ask what was wrong.

Meanwhile, even after Crawford had assumed the "surrender position," Deputy Geiger continued saying "get on the ground" and "I'll shoot you in the fucking head." (R. 69-6, PageID# 1345–46, 1352–53, 1409). Crawford refused to comply with this command because he believed Geiger was "out of control" and feared for his own safety. Around the same time, several more police officers arrived on the scene, including defendant Cory Lee, a deputy for the Allen County Sheriff's Department, and defendants-appellants Nicholas Hart and Jesse Evilsizer, a sergeant for the Lima Police Department and an officer for the Elida Police Department, respectively. Deputy Lee, Sergeant Hart, and Officer Evilsizer were all responding to a call for assistance that Deputy Geiger had made over his radio during the initial standoff with Crawford and Reed. In his call for assistance, Geiger stated that he had encountered "armed suspects."

As the other officers began to arrive, Deputy Geiger changed his command to Crawford from "get on the ground" to "put your hands on the truck." When Crawford complied with the latter order, Geiger "bounce[d] [Crawford's] head off the hood of the truck" and said, "Now you're going to jail motherfucker," as he put his full body weight on Crawford's neck. (*See* R. 69-6, PageID# 1357, 1361, 1371). Geiger also removed Crawford's pistol from his holster.

### 1.  Physical Contact between Hart and Ornelas, Hart and Reed[2]

While Geiger still had Crawford pushed against the truck, Crawford shouted to Ornelas and Reed to take out their cell phones and record Deputy Geiger "violating [Crawford's] rights." Although Ornelas did not immediately understand Crawford's statement, Reed went to reach for his phone.  At his deposition, Reed testified that "the next thing [he] kn[e]w," Sergeant Hart was pushing Ornelas away and then throwing Reed to the ground.  When asked to elaborate on his physical contact with Sergeant Hart, Reed said that Hart grabbed him and took him to the ground so that he landed facedown.  Reed also testified that he received no commands from the surrounding police officers—to get on the ground or otherwise—before being taken down by Sergeant Hart.  For his part, Hart testified that he did not recall seeing anything on Reed's person, including a cell phone.

According to Reed, after he was thrown to the ground, "there were multiple law enforcement officers with their knees and feet on [his] back while [he] was just [ly]ing there on the ground not resisting."  (R. 69-4, PageID# 1073).  He also testified that an (unidentified) officer pointed a taser at him.  In the ensuing seconds, Reed was handcuffed, lifted up from the ground, and escorted to a police cruiser.  Although it was Sergeant Hart who placed Reed in handcuffs and ultimately drove Reed to the Allen County jail for processing, the record indicates that Reed was initially escorted to a police cruiser by Ohio State Highway Patrol troopers.

As indicated, before throwing Reed to the ground and placing him in handcuffs, Sergeant Hart made physical contact with Ornelas.  Specifically, Plaintiffs testified that Hart pushed Ornelas with an open hand against her chest, causing her to fall back against Reed's truck.

---

[2] Only Sergeant Hart and Officer Evilsizer appealed the district court's denial of their qualified immunity claims.  Therefore, except as necessary to provide context, this opinion does not separately analyze physical contact between Plaintiffs and any other officers.

Ornelas testified that no one, including Hart, was talking to her or giving her instructions prior to Hart shoving her. She also testified that she was not speaking at the time she was pushed. Either immediately before or after pushing Ornelas, Hart told her, "Get back and shut the fuck up." (*Compare* R. 69-7, PageID# 1848, *with* 1852–53). Ornelas did not have any other physical contact with Hart.

### 2. Physical Contact between Evilsizer and Crawford

After Geiger slammed Crawford's head, both Geiger and Evilsizer placed Crawford in handcuffs. Crawford testified that he "offer[ed] no resistance whatsoever" while he was being handcuffed and that his hands and wrists were not injured even though the handcuffs were tight. Evilsizer escorted Crawford to his police cruiser and loosened the handcuffs at Crawford's request. Crawford did not have any other physical contact with Evilsizer, but testified that Evilsizer saw and/or heard Geiger slam Crawford's head against the truck.

### 2. Plaintiffs are Briefly Jailed

Ultimately, Plaintiffs were placed in separate police cruisers and driven to the Allen County jail. After being jailed for approximately three hours, Crawford, Ornelas, and Reed were released and then driven back to Ms. Crawford's house by Reed's wife Christine.

### B. Procedural Background

In 2013, Plaintiffs filed a civil rights complaint against Deputy Geiger, Deputy Lee, Sergeant Hart, Officer Evilsizer, and several other law enforcement officers who responded to Crawford's Furniture on the evening of August 26, 2012. Among other things, Plaintiffs' complaint alleged that the officers violated their constitutional rights under the First, Fourth, and Fourteenth Amendments by: preventing them from recording "government officials engaging in matters of public interest"; using excessive and objectively unreasonable force against their

persons; and unreasonably seizing their persons. In addition to suing the on-scene officers, Plaintiffs also sued the law enforcement agencies—and the corresponding supervisory officials—that employed them. The district court dismissed Plaintiffs' claims against the law enforcement agencies and supervisory officials, but permitted Plaintiffs' claims against the on-scene officers to proceed. *Crawford v. Geiger*, 996 F. Supp. 2d 603 (N.D. Ohio 2014).

Thereafter, the officers filed motions for summary judgment on Plaintiffs' claims against them. *Crawford v. Geiger*, 131 F. Supp. 3d 703 (N.D. Ohio 2015). In its summary judgment order, the district court granted summary judgment on Plaintiffs' First Amendment claims, *id.* at 714–15 & n.5, and found that the Ohio State Highway Patrol troopers who had been named as defendants were entitled to qualified immunity on all claims against them, *id.* at 709 & n.3, 714, 720. However, the district court concluded that: Deputy Geiger, Deputy Lee, and Sergeant Hart were not entitled to qualified immunity on Plaintiffs' excessive force and unreasonable seizure claims; and Officer Evilsizer was not entitled to qualified immunity on Plaintiffs' excessive force claim. *Id.* at 714, 716–21. Sergeant Hart and Officer Evilsizer (together, "Defendants")—but not Deputy Geiger or Deputy Lee—timely appealed those determinations.

## II.    DISCUSSION

### A.  Standard of Review

We review *de novo* a district court's denial of summary judgment, including denials on qualified immunity grounds. *Heggen v. Lee*, 284 F.3d 675, 679 (6th Cir. 2002). "A moving party is entitled to summary judgment if the pleadings, the discovery and the disclosure materials on file, and any affidavits 'show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013) (alteration in original) (quoting Fed. R. Civ. P. 56(a)). In determining whether

summary judgment is warranted, we construe the evidence and draw all reasonable inferences in favor of the non-moving party. *Id*.

## B. Jurisdiction

"While most denials of summary judgment are nonfinal orders which cannot be appealed pursuant to 28 U.S.C. § 1291, it is well established that an order denying qualified immunity is immediately appealable." *Harrison v. Ash*, 539 F.3d 510, 516 (6th Cir. 2008). Nonetheless, we may exercise jurisdiction over an interlocutory appeal of a district court's order denying qualified immunity "'only if th[e] appeal involves the abstract or pure legal issue of whether the facts alleged by the plaintiff constitute a violation of clearly established law.'" *Gregory v. City of Louisville*, 444 F.3d 725, 742 (6th Cir. 2006) (quoting *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998)). A defendant seeking an interlocutory appeal of a district court's denial of qualified immunity must "be willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal." *Berryman*, 150 F.3d at 563.

In this case, Defendants concede Plaintiffs' version of the facts. Because their appeals therefore raise purely legal issues regarding the applicability of the Fourth Amendment to those facts, we have jurisdiction. *See Harrison*, 539 F.3d at 517.

## C. Legal Standards: Qualified Immunity and the Fourth Amendment

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (citation omitted). "The

dispositive question is whether the violative nature of *particular* conduct is clearly established," and "[t]his inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* (citations and internal quotation marks omitted). In determining whether the violative nature of the officer's conduct was clearly established, this Court "need not, of course, find a case in which 'the very action in question has previously been held unlawful.'" *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). However, "the unlawfulness must be apparent" in light of pre-existing law. *Anderson*, 483 U.S. at 640. "To determine whether a constitutional right is clearly established, 'we must look first to decisions of the Supreme Court, then to decisions of this [C]ourt and other courts within our circuit, and finally to decisions of other circuits.'" *Brown v. Lewis*, 779 F.3d 401, 418–19 (6th Cir. 2015) (quoting *Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 606 (6th Cir. 2006)).

In deciding whether qualified immunity applies, we must assess: (1) whether the facts, when viewed in the light most favorable to the plaintiff, demonstrate the violation of a constitutional right; and (2) whether the right claimed by the plaintiff was clearly established at the time of the defendant's alleged misconduct. *Burgess*, 735 F.3d at 472. We may consider these two prongs in either order. *Pearson*, 555 U.S. at 236, 242.

Plaintiffs' claims arise from the protections afforded by the Fourth Amendment of the United States Constitution. "The Fourth Amendment, made applicable to the States by the Fourteenth Amendment, provides in pertinent part that the 'right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated[.]" *Thomas v. Cohen*, 304 F.3d 563, 569 (6th Cir. 2002) (quoting U.S. Const. amend. IV). The Supreme Court has defined a "seizure" as "meaningful interference, however brief, with an individual's freedom

of movement." *United States v. Jacobsen*, 466 U.S. 109, 113 n.5 (1984); *see also United States v. Mendenhall*, 446 U.S. 544, 553 (1980) (holding that a "seizure" takes place when an individual's "freedom of movement is restrained" through the use of "physical force or a show of authority"). Importantly, "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the surrounding circumstances, a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 554.

The Fourth Amendment also prohibits the use of excessive force against free citizens. *Burgess*, 735 F.3d at 472. Excessive force claims must be analyzed "under the 'objective reasonableness' standard of the Fourth Amendment," which asks whether the seizure was justified under the totality of the circumstances. *Bass v. Robinson*, 167 F.3d 1041, 1045–46 (6th Cir. 1999) (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989)). In assessing objective reasonableness, courts consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015).

## D. Analysis

We must assess each officer's liability individually and based on the officer's own actions. *See Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010). Accordingly, we examine Plaintiffs' claims against each officer in turn.

**1. Crawford's Claim Against Evilsizer**

Officer Evilsizer's only physical interaction with Plaintiffs was limited to assisting Deputy Geiger with placing handcuffs on Crawford and escorting Crawford to a police cruiser. For the reasons explained below, we find that Officer Evilsizer's conduct was objectively reasonable based on the surrounding circumstances, including the knowledge he had at the time he encountered Crawford and Deputy Geiger. *See Kingsley*, 135 S. Ct. at 2473.

Officer Evilsizer drove to Crawford's Furniture after receiving a transmission from the Allen County dispatcher regarding "a possible burglary in progress or breaking and entering." Because Deputy Geiger radioed instructions not to pull into the main entrance, Evilsizer parked his police cruiser at a nearby apartment complex. Evilsizer was waiting at the apartment complex for a minute to a minute-and-a-half when he heard Deputy Geiger's call for assistance, which sounded as if "[Geiger] was in some kind of struggle or something was going on." (R. 69-11, PageID# 2257).

After driving to Crawford's Furniture and parking his cruiser behind Deputy Lee's, Officer Evilsizer saw Deputy Geiger "giving verbal commands" to Crawford and Reed. Evilsizer also observed that Crawford was wearing a holstered pistol on his left side, so he pointed his service weapon in Crawford and Reed's direction.

The parties agree that Deputy Geiger instructed Crawford to "get up against the truck," but dispute whether Crawford complied with this command. The parties also dispute whether Officer Evilsizer saw or heard Deputy Geiger slam Crawford's head against the truck. However, because Defendants have conceded Plaintiffs' version of the facts for the purposes of this appeal, we must credit Plaintiffs' evidence that by the time Officer Evilsizer assisted Deputy Geiger with placing Crawford in handcuffs: Crawford had already complied with Geiger's order to put his

hands on the truck, Geiger had nonetheless slammed Crawford's head against the fender, and Evilsizer was standing close enough to this incident to see or hear Geiger slamming Crawford's head despite Crawford's compliance.

Whether Officer Evilsizer may be held liable for a Fourth Amendment violation must be assessed by looking at his individual actions. *See Binay*, 601 F.3d at 650. "As a general matter, [an officer's] mere presence during [an] altercation, without a showing of some direct responsibility, cannot suffice to subject them to liability." *Burgess*, 735 F.3d at 475. Instead, in order to "hold an officer liable for the use of excessive force, a plaintiff must prove that the officer '(1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force.'" *Binay*, 601 F.3d at 650 (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)).

Plaintiffs' theory of liability hinges on only the first category: active participation.[3] Specifically, Plaintiffs argue that Officer Evilsizer actively participated in the use of excessive force against Crawford during because by the time Evilsizer intervened, Crawford: was "no longer suspected of burglary"; "presented no threat to the officers or anyone at the scene"; and "was not actively resisting or attempting to evade arrest."[4] *Appellees' Br.* at 42–44. All of this may be true, but these contentions do not address Evilsizer's active participation. Thus, these arguments are unpersuasive.

Officer Evilsizer responded to Crawford's Furniture only after receiving the 911 dispatcher's transmission about the possible commission of a felony, *see* Ohio Rev. Code

---

[3] Because there is no evidence that Officer Evilsizer was Deputy Geiger's supervisor, and no viable argument, on this record, that Evilsizer had sufficient time to prevent Geiger from slamming Crawford's head against the truck (or even could have anticipated that Geiger would employ such force against Crawford), the other two categories are inapplicable in any event. *See Bletz v. Gribble*, 641 F.3d 743, 754 (6th Cir. 2011).

[4] Plaintiffs also argue that the force used by Officer Evilsizer was unreasonable because Evilsizer pointed his gun at Crawford. However, because Plaintiffs failed to make this argument below, it is forfeited on appeal. *See Williamson v. Recovery Ltd. P'ship*, 731 F.3d 608, 626 (6th Cir. 2013).

§§ 2911.12, 2911.13, and hearing Deputy Geiger's subsequent calls for assistance relaying that he had encountered two "armed suspects." Arriving on the scene, Officer Evilsizer saw that Crawford was wearing a holstered pistol at his waist and observed that Deputy Geiger was still embroiled in a verbal confrontation with Crawford and Reed. Further, although Plaintiffs have put forth evidence indicating that Crawford and Ornelas attempted to de-escalate the situation by explaining their relationships to the property to Deputies Geiger and Lee, there is no indication that these statements were made to Evilsizer, who arrived after Geiger and Lee, or even said within Evilsizer's earshot.

Plaintiffs' reliance on our opinion in *Binay v. Bettendorf*, 601 F.3d 640 (6th Cir. 2010), and the Eastern District of Michigan's unpublished order in *Eldridge v. City of Warren*, No. 10-12893, 2012 WL 1048642 (E.D. Mich. Mar. 28, 2012), *aff'd*, 533 F. App'x 529 (6th Cir. 2013), is also unpersuasive. Unlike Officer Pongracz in *Binay*, there is no indication that Officer Evilsizer was the leader of the officers who responded to Crawford's Furniture or that he had the ability to instruct Deputy Geiger about Geiger's use of force against Crawford. *See Binay*, 601 F.3d at 644–45, 651. There is also no evidence that Evilsizer sanctioned or authorized Geiger's interactions with Plaintiffs. *See id.* at 651. Further, unlike Officer Horlocker in *Eldridge*, Officer Evilsizer did not threaten Crawford with *any* use of force and there is no evidence that his handcuffing of Crawford was unreasonably "forceful" based on the surrounding circumstances. *See Eldridge*, 2012 WL 1048642, at *1, *6. Additionally, unlike Officer Horlocker, Officer Evilsizer was not present during most of the confrontation between his fellow officer (Deputy Geiger) and the plaintiffs (Crawford and Reed), and was therefore equipped with only limited information—from Geiger's call for assistance and his own observations—about the prior interactions between Geiger, Crawford, and Reed.

More fundamentally, despite Plaintiffs' apparent attempts to attribute Deputy Geiger's conduct to Officer Evilsizer, Evilsizer may be held liable only for "his own individual conduct and not the conduct of others." *Pollard v. City of Columbus, Ohio*, 780 F.3d 395, 402 (6th Cir. 2015).[5] After responding to a 911 call about a possible felony, receiving calls for assistance from a fellow officer who had reportedly encountered two armed suspects, encountering that same fellow officer engaged in a shouting match with two unknown individuals, and observing that one of those individuals was wearing a holstered pistol, Evilsizer deployed only enough force to help another officer, Deputy Geiger, handcuff the armed individual. Examining the factors set out in *Graham*, and in light of the suspected felony in progress, as well as the fact Officer Evilsizer observed an armed Crawford engaging in a verbal confrontation with Deputy Geiger and therefore had reason to be concerned about an immediate threat to Geiger's safety, we find that it was objectively reasonable for Evilsizer to deploy sufficient physical force against Crawford to assist Deputy Geiger with placing Crawford in handcuffs. *See* 490 U.S. at 396. Accordingly, we reject the district court's conclusion that Officer Evilsizer violated Crawford's Fourth Amendment right to be free from excessive force. Because there was no constitutional violation, we do not need to determine whether Crawford's claimed right was clearly established at the time of the incident. *See Williams v. Sandel*, 433 F. App'x 353, 360 (6th Cir. 2011); *Dunn v. Matatall*, 549 F.3d 348, 355 (6th Cir. 2008).

For the aforementioned reasons, we **REVERSE** the district court's denial of qualified immunity as to Officer Evilsizer.

---

[5] The key shortcoming affecting the district court's analysis of Officer Evilsizer's qualified immunity claim is that it apparently attributed actions taken by only Deputy Geiger to both Geiger and Evilsizer. *Crawford*, 131 F. Supp. 3d at 716–17 (stating that both Geiger and Evilsizer pinned Crawford against Reed's truck). The district court also failed to acknowledge the notable difference in the amount of information possessed by Geiger, who was on the scene before any other officer, and Evilsizer, who arrived only moments before the situation with Plaintiffs was under the responding officers' control.

**2. Ornelas' and Reed's Claims Against Hart**

Next, we must examine Sergeant Hart's qualified immunity defense. After receiving Deputy Geiger's call for assistance, Hart drove his police cruiser to Crawford's Furniture and arrived on location less than a minute later. Once there, Hart observed Deputy Lee standing near a police vehicle and yelling at Reed and Ornelas.

At this point, the parties' testimony diverges substantially. According to Sergeant Hart, Deputy Lee asked Hart to separate Reed and Ornelas. Hart then "went between the two, . . . stepped to the side, [and] placed [his] hands immediately on [Reed's and Ornelas'] chest[s]," telling them to "get back." (R. 69-9, PageID# 2105–06). When Hart did not receive an "immediate response" from Reed and Ornelas, he shoved them apart with enough force to cause them to separate. Ornelas then began shouting at Hart, asking if he "had just pushed a woman." (*Id.* at 2108). According to Hart, a moment after Reed and Ornelas were separated and while Hart was glancing at Deputy Lee, Reed took "a step forward with his hands still out and initiated contact [against Hart's] chest with his chest." (*Id.* at 2109). Sergeant Hart then "placed [Reed] in an arm lock and took him down to the ground." (*Id.*). Prior to the takedown, Hart did not see "anything on [Reed]," including a cell phone or any other object.

While Hart was on the ground with Reed, Ornelas knelt in front of him with her face approximately six to ten inches away, yelling at him for pushing a woman. When Ornelas did not obey Hart's order to step back from his "compromised position" on the ground with Reed, Hart reached up and shoved her away, pushing hard enough to cause her to take a couple of steps backward. Hart then proceeded to handcuff Reed.

Plaintiffs' descriptions of their physical interactions with Sergeant Hart differ significantly from Hart's. According to Reed, at the time he was thrown to the ground, he was

"not expecting it" because he had not been given any commands by the surrounding police officers, including Hart. Instead, Reed was reaching for his cell phone—in an attempt to comply with Crawford's request that he record the interaction between Crawford and Deputy Geiger—when Hart pushed Ornelas and then grabbed Reed and threw him to the ground. Although Reed was standing approximately five feet away from his discarded rifle, there is no evidence that Hart knew that the weapon was nearby. After Officer Hart threw him to the ground, Reed felt "multiple" police officers place their hands and knees on his back—despite his non-resistance—and saw a taser being pointed in his direction by an unidentified officer.

Ornelas' description of her interaction with Sergeant Hart also diverges substantially from Hart's account. According to Ornelas, by the time she saw Geiger, Crawford, and Reed near the warehouses, Crawford and Reed had already put down their long guns. After Ornelas attempted to explain the situation to officers (which failed) and spoke to Reed (who told her he did not know what was wrong), Ornelas heard Crawford's instructions to record Geiger. Moments later, Sergeant Hart pushed Ornelas in the chest, telling her to "[g]et back and shut the fuck up." According to Ornelas, she was not speaking to anyone and no one was speaking to her—or had told her to "back up"—when Hart shoved her. Instead, officers were ignoring her. After being shoved, Ornelas fell a couple steps back into Reed's truck. When Ornelas said to Hart, "did you seriously just hit me," Deputy Lee grabbed Ornelas' forearm, twisted it behind her back, and put her in handcuffs.

### a. Ornelas' Unreasonable Seizure Claim

"The question [of] whether a seizure has occurred within the meaning of the Fourth Amendment is an objective one." *Peete v. Metro. Gov't of Nashville & Davidson Cty.*, 486 F.3d 217, 220 (6th Cir. 2007). Further, the Supreme Court has made clear that a seizure occurs when

there is meaningful interference with an individual's freedom of movement through the use of "physical force or a show of authority," *Mendenhall*, 446 U.S. at 553, regardless of how briefly this interference lasts, *Jacobsen*, 466 U.S. at 113 n.5; *see also United States v. Sugrim*, 732 F.2d 25, 28 (2d Cir. 1984) ("A detention no matter how momentary is a seizure under the Fourth Amendment."). Thus, Hart's authorities cited in support of the proposition that the existence of a seizure should be determined by its length, all of which are from courts in the Third Circuit, are unpersuasive. Instead, the Supreme Court has instructed that "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 554. Circumstances indicating a seizure include: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.*

In this case, according to Plaintiffs' version of the facts, Sergeant Hart shoved Ornelas in the chest while they were in the presence of at least three other police officers (Deputy Geiger, Deputy Lee, and Officer Evilsizer) and told her to "get back and shut the fuck up." As a result of Hart's shove, Ornelas was pushed at least two steps back against Reed's truck, restricting her freedom of movement. She then asked why Hart had pushed her and was taken to the ground and handcuffed by Lee. Thus, although there is no indication that Sergeant Hart displayed a weapon during his interactions with Ornelas, because there is evidence of the three remaining factors flagged by the *Mendenhall* Court—physical touching, the "threatening presence" of multiple officers, and the use of language indicating that compliance might be compelled—a reasonable person would have believed that she was not free to leave after Hart's shove. *See id.*

18

Further, the Supreme Court's Fourth Amendment jurisprudence makes clear that the duration of this push is of no moment when considering whether a seizure occurred. *See Jacobsen*, 466 U.S. at 113 n.5. Accordingly, we find that Hart seized Ornelas when he pushed her.

To violate the Fourth Amendment, however, a seizure must be unreasonable. *See Brower v. Cty. of Inyo*, 489 U.S. 593, 599 (1989) ("'Seizure' alone is not enough for § 1983 liability; the seizure must be 'unreasonable.'"). For those seizures that fall short of a traditional arrest, like Hart's push, the police officer's conduct is unreasonable if he seizes an individual without reasonable suspicion of criminal activity.[6] *See United States v. Arvizu*, 534 U.S. 266, 273 (2002); *United States v. Richardson*, 385 F.3d 625, 629 (6th Cir. 2004). This is because an officer may briefly seize an individual for investigatory purposes only if, "under the totality of the circumstances, [the officer] has 'reasonable suspicion,' that is, 'a particularized and objective basis for suspecting the particular person of criminal activity.'" *Brown*, 779 F.3d at 412 (citations and ellipses omitted).

There is no evidence that Sergeant Hart suspected Ornelas of any criminal activity, including the possible burglary that precipitated her 911 call, in the moments preceding the seizure. Further, under Plaintiffs' version of the facts, prior to the seizure, Ornelas had: attempted to explain to officer the misunderstanding underlying the confrontation between Geiger, Crawford, and Reed; asked Reed what was wrong; and heard Crawford make a statement, which she did not fully comprehend at the time, about recording Deputy Geiger's actions. Plaintiffs have also put forth evidence indicating that immediately before she was

---

[6] Although Plaintiffs argue that Sergeant Hart lacked probable cause when he seized Ornelas—rather than reasonable suspicion—there are no facts supporting Plaintiffs' apparent assumption that Hart's push against Ornelas' chest constituted a traditional arrest requiring probable cause. *See Terry v. Ohio*, 392 U.S. 1, 16 (1968) (describing a traditional arrest as a seizure which results "in a trip to the station house and prosecution for crime"). This is particularly true in light of the fact that it was Deputy Lee, and not Sergeant Hart, who put Ornelas in an "arm bar," handcuffed her, escorted her to the police cruiser, and drove her to the police station, i.e., took the actions associated with placing an individual under arrest.

19

pushed, Ornelas was not speaking, had not received a command from any of the surrounding police officers, and was in fact being ignored by officers. Thus, we agree with the district court's conclusion that "a reasonable jury could find Ornelas, who was unarmed. . . sought to explain and clarify the situation, and thus assist, not interfere with, the officers whom she had summoned with her 911 call." *Crawford*, 131 F. Supp. 3d at 717. Because a jury could find that Hart violated Ornelas' right to be free from unreasonable seizures when he pushed her without reasonable suspicion of criminal activity, we must next examine whether Ornelas' claimed right was clearly established at the time of the seizure. For the reasons stated below, we answer this question affirmatively.

Case law existing prior to the August 26, 2012 seizure makes clear that the duration of an officer's interference with an individual's freedom of movement is not determinative as to whether a seizure has occurred, *Jacobsen*, 466 U.S. at 113 n.5 (collecting cases), and that an officer must have a reasonable suspicion of criminal activity to even briefly seize an individual, *Arvizu*, 534 U.S. at 273; *see also United States v. Cortez*, 449 U.S. 411, 417 (1981)). Thus, at the time of the August 26, 2012 seizure, existing precedent had placed "beyond debate" the question of whether seizing an individual without reasonable suspicion of criminal activity violated the Fourth Amendment. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *see also Jones*, 562 F.3d at 773 ("Absent reasonable suspicion, . . . a brief investigatory seizure is impermissible"). Accordingly, we **AFFIRM** the district court's denial of qualified immunity to Sergeant Hart on Ornelas' unreasonable seizure claim.

### b. Ornelas' Excessive Force Claim

As indicated, an officer's use of force must be objectively reasonable in light of the totality of the circumstances, *Bass*, 167 F.3d at 1045–46, including: "the severity of the crime at

issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight," *Graham*, 490 U.S. at 396. In determining whether the force applied was objectively reasonable, we must "make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time." *See Kingsley*, 135 S. Ct. at 2473.

According to Plaintiffs, at the time Hart seized Ornelas: she was not suspected of committing any crime, severe or otherwise; she was unarmed and did not pose an immediate threat to Hart or any of the surrounding officers; and she was not resisting arrest or even failing to comply with a command. In other words, a jury crediting Ornelas' testimony could find that all three *Graham* factors were absent at the time Hart pushed against her chest and caused her to fall back against Reed's truck.

Further, at the time of Hart's conduct, "the right to be free from physical force when one is not resisting the police" was clearly established. *Wysong*, 260 F. App'x at 856 (citing *Smoak v. Hall*, 460 F.3d 768, 784 (6th Cir. 2006); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004)); *see also Griffith v. Coburn*, 473 F.3d 650, 659–60 (6th Cir. 2007) (noting that it was clearly established that officers may not use gratuitous violence against an individual who "pose[s] no threat to the officers or anyone else"). Under Plaintiffs' version of the facts, there is no indication that Ornelas was suspected of a crime, resisting arrest, or posed a threat to any of the surrounding officers when Sergeant Hart used force against her. Because her right to be free from force while complaint, non-resistant, and non-violent was clearly established prior to August 26, 2012, we **AFFIRM** the district court's denial of qualified immunity on Ornelas' excessive force claim.

### c. Reed's False Arrest Claim

Sergeant Hart does not dispute that his seizure of Reed—which involved throwing Reed to the ground, placing him in handcuffs, and, later, driving him to jail—constituted a traditional arrest. Instead, Hart argues that the arrest was reasonable because Hart "arrested Reed in response to [Reed] reaching toward a black object on his waist while standing in a shadowy environment within close proximity to unsecured weapons on the ground and an armed man being arrested at the scene of a suspected nighttime break-in from which a fellow officer had requested assistance in dealing with armed suspects." *Hart Br.* at 22. In the alternative, Hart cites this Court's decision in *Bletz v. Gribble*, 641 F.3d 743 (6th Cir. 2011), for the proposition that "[e]ven if there was not probable cause sufficient to support Reed's arrest, which there was, his arrest was still reasonable so that the scene and weapons could be secured in order to ensure the safety of the officers and persons at the scene and to allow the officers to conduct an investigation into the reported break-in." *Id.* at 21–22.

With regard to this first point, Hart's assertion that he arrested Reed for reaching for a black object on his waist is belied by Hart's own deposition testimony. At his deposition, Hart testified that he threw Reed to the ground, handcuffed him, and drove him to the police station because Reed "chest bumped" him. Specifically, Hart stated:

> After I had separated [Reed and Ornelas], I briefly glanced at Deputy Lee. As I looked back at [Reed,] he had taken a step forward with his hands still out and initiated contact in my chest with his chest. At that point in time I grabbed him by the arm and placed him in an arm lock and took him down to the ground, sir. . . . Once he landed on the ground, I do not recall [Reed] offering any more resistance to me . . . . He stayed on his stomach until I could place him in handcuffs.

(R. 69-9, PageID# 2109, 2111–12). Later in his deposition, Hart not only testified that he did not see Reed holding a phone, but when asked whether Reed had anything on him, Hart responded, "I cannot recall him having anything that I saw, sir." (*Id.* at 2112). Hart also testified that he

perceived Crawford's holster as "empty" and did not see any guns "in the area." Thus, although Hart's deposition makes clear that he went to Crawford's Furniture in response to Deputy Geiger's call for assistance regarding two armed suspects, there is no indication that he (a) realized that Reed had reached for an object of any kind, including a possible weapon, when he threw Reed to the ground, or (b) knew that Reed and Crawford's unsecured firearms had been dropped near the location where he and Reed were standing. Thus, contrary to Hart's arguments on appeal, there is no evidence that, at the time of the incident, Hart had knowledge that would lead him to reasonably fear that Reed would attempt to grab or use a weapon against an officer.

"Any arrest, whether formal or *de facto*, requires probable cause." *Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000). "Probable cause determinations involve an examination of all facts and circumstances *within an officer's knowledge at the time of an arrest*." *Estate of Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999) (emphasis in original); *see also Green v. Throckmorton*, 681 F.3d 853, 865 (6th Cir. 2012) (noting that an officer can only have knowledge of that which he observes or is told). In this appeal, Sergeant Hart wishes to hang his hat on knowledge that, at the time he arrested Reed, Reed was reaching for an object at his waist and standing near unsecured weapons. However, there is no evidence that Sergeant Hart—as opposed to one of his fellow officers—had this knowledge. Instead, Hart's own deposition testimony indicates that he arrested Reed for a completely separate and distinct reason: an alleged chest bump. Thus, although Reed's own testimony states that he was reaching for his phone when Hart arrested him, Hart cannot retroactively rely on this act to resolve the qualified immunity question because there is no evidence that Hart *knew* of this act when he arrested Reed. *See Green*, 681 F.3d at 865; *Dietrich*, 167 F.3d at 1011–12; *see also*

23

*Sutkiewicz v. Monroe Cty. Sheriff*, 110 F.3d 352, 362 (6th Cir. 1997) (Batchelder, J., dissenting) ("Evidence relat[ed] to probable cause that [the officers] did not know of is immaterial").

Probable cause to justify an arrest requires "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). In this case, by the time Hart had arrived on the scene, he observed that Reed was unarmed and that Deputy Lee was yelling at Reed and Ornelas with his firearm or taser pointed at them. Further, there is no evidence that Hart believed, or was given any reason to believe, that Reed had committed the possible burglary or breaking and entering that gave rise to Ornelas' 911 call. For there to be probable cause, the officer's "belief of guilt must be particularized with respect to the person to be . . . seized." *See United States v. Romero*, 452 F.3d 610, 616 (6th Cir. 2006) (citation and quotation marks omitted). Based on these circumstances, and the circumstances described above, a reasonable jury crediting Plaintiffs' version of the facts could find that Hart (1) arrested Reed even though Hart did not know that Reed made any type of reaching motion or was standing near unsecured weapons and (2) lacked probable cause to arrest Reed for burglary, breaking and entering, or any other crime.

We also reject Hart's second argument—that he could lawfully detain Reed in order to secure Crawford and Reed's weapons and assure the safety of his fellow officers. First, although this Court has identified a "general right to detain without reasonable suspicion or probable cause" when "necessary to secure the scene of a valid search or arrest and ensure the safety of officers and others," this tactic is intended to be used for "investigative purposes" and such a detention must be "limited or routine." *Bletz*, 641 F.3d at 755; *see also Ingram v. City of*

*Columbus*, 185 F.3d 579, 591–92 (6th Cir. 1999) ("While we have occasionally permitted the use of [handcuffs and firearms] to detain private individuals for investigative purposes [without reasonable suspicion or probable cause], we have done so only where the officers making the seizures acted out of a justifiable fear of personal safety."). Where there is "no evidence to suspect [the plaintiff] of a crime or [suspect] that [he] would present a continued safety risk," such a detention is unreasonable. *Bletz*, 641 F.3d at 755. Additionally, in light of the lack of evidence that Hart was aware of Plaintiffs' discarded weapons, his reliance on *Bletz* appears misplaced. After all, it is unclear how Hart could fear for his fellow officers' safety based on the presence of weapons of which he was unaware. Finally, Hart's seizure of Reed was not a limited or routine detention performed for investigatory purposes, but instead constituted a traditional arrest—Hart threw Reed to the ground and placed him in handcuffs, then later drove Reed to jail. Thus, *Bletz* is of little relevance to the facts of this case. Accordingly, because there is no indication that Hart believed Reed had committed a crime, knew Reed was standing near two discarded firearms, or intended to detain Reed only temporarily—facts that may have justified a limited detention under *Bletz*—a reasonable jury could find that Hart violated Reed's Fourth Amendment rights by arresting Reed without probable cause.[7]

Sixth Circuit precedent existing at the time of Reed's August 26, 2012 arrest made clear that a traditional arrest requires probable cause.[8] *See Cherrington v. Skeeter*, 344 F.3d 631, 637

---

[7] Although our reasons for finding a constitutional violation on this count are different from those relied on by the district court, *see Crawford*, 131 F. Supp. 3d at 717, we may affirm the district court's decision "on any grounds supported by the record," *Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 569 (6th Cir. 2001); *see also Russ' Kwik Car Wash, Inc. v. Marathon Petroleum Co.*, 772 F.2d 214, 216 (6th Cir. 1985) ("A decision below must be affirmed if correct for any reason, including a reason not considered by the lower court.").

[8] Quoting the Supreme Court's decision in *Mullenix*, Hart argues that in evaluating the second prong of the qualified immunity analysis, "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established." *Hart Reply Br.* at 8. He also argues that qualified immunity is warranted because Plaintiffs have failed to "demonstrate[e] that *every* other officer in Sgt. Hart's position would have believed [Reed's] arrest to be improper." *Id.* at 9. However, we are persuaded that every *reasonable* officer confronted with the same situation

(6th Cir. 2003) ("[I]f [the plaintiff] was arrested, . . . [the officers'] action must have been supported by probable cause."); *see also Haley v. Elsmere Police Dep't*, 452 F. App'x 623, 629 (6th Cir. 2011) ("Plainly, the federal right to be subject only to arrest upon probable cause was clearly established.") (quoting *Everson v. Leis*, 556 F.3d 484, 500 (6th Cir. 2009)). Because this rule was clearly established at the time of the challenged conduct, and a reasonable jury crediting Plaintiffs' evidence could find that probable cause was lacking, we **AFFIRM** the district court's denial of qualified immunity on Reed's false arrest claim.

### d. Reed's Excessive Force Claim

Finally, we must decide whether Sergeant Hart's use of force against Reed—throwing Reed to the ground[9]—was objectively reasonable in light of the *Graham* factors.

The first *Graham* factor relates to the severity of the crime at issue. In this case, officers originally responded to Crawford's Furniture based on a 911 call regarding a possible burglary or breaking and entering. Although burglary and breaking and entering are both felonies under Ohio law, *see* Ohio Rev. Code §§ 2911.12, 2911.13, and therefore crimes of notable severity, there is no evidence, including from Hart's own testimony, suggesting that Hart suspected that Reed had committed a burglary or breaking and entering. Additionally, even though Hart himself responded to the scene after receiving Geiger's call for assistance, by the time Hart arrived, Reed was unarmed and was not behaving aggressively towards Geiger. Accordingly, a reasonable jury could find that there Hart had no reason to suspect Reed of a crime, severe or

---

as Hart would have known that it was unlawful to arrest Reed if there was no indication that Reed had committed any crime. *See Mullenix*, 136 S. Ct. at 314.

[9] Hart is correct that Reed could not identify which of the officers present at the time of his arrest placed their feet or knees on his back after he was thrown to the ground. Because there is no evidence that it was Hart, as opposed to another officer, who placed his foot or knee on Reed's back, we do not consider this conduct in our examination of Reed's excessive force claim. *See Binay*, 601 F.3d at 650 ("Each defendant's liability must be assessed individually based on his own actions.").

otherwise, when he used force against Reed. Thus, the first *Graham* factor weighs in favor of Plaintiffs.

With regard to the second *Graham* factor—the immediate safety threat posed by the suspect to police and others—construing the facts in the light most favorable to Plaintiffs, there is no evidence that Hart had knowledge of facts that would give rise to a reasonable belief, on Hart's part, that Reed posed a threat to Hart's safety or anyone else's. Plaintiffs have put forth evidence that Reed was unarmed, was not disobeying orders, and was merely reaching for his cell phone at Crawford's request—an act that Hart apparently did not see—when Hart threw him to the ground.[10]

With regard to the third factor—whether the suspect was actively resisting or attempting to evade arrest—a reasonable jury could find that Reed was neither resisting arrest nor attempting to evade arrest (because no arrest had been initiated by Hart or anyone else) at the time Hart threw him to the ground. Instead, Reed claims that he was surprised by Hart throwing him down because he had received no commands from officers in the moments immediately before.

As noted above, at the time of the August 26, 2012 incident, "the right to be free from physical force when one is not resisting the police" was clearly established. *Wysong*, 260 F. App'x at 856; *see, e.g.*, *Grawey v. Drury*, 567 F.3d 302, 314 (6th Cir. 2009) (concluding that the plaintiff's clearly established rights were violated where the plaintiff "was not ordered under arrest, he stopped running away, [and] he waited for police with his hands against a wall, [but] he was [nonetheless] immediately pepper sprayed . . . until he lost consciousness"); *Lyons v. City of*

---

[10] Although Sergeant Hart suggests that his use of force was permissible because Reed's act of reaching for his cell phone "could reasonably be interpreted as reaching for a weapon," *Hart Br.* at 29, because Hart testified that he did not see Reed reach for his cell phone or see anything else on Reed's person, this argument lacks merit.

*Xenia*, 417 F.3d 565, 578 (6th Cir. 2005) (noting that courts have found that "tackling [rises] to the level of excessive force" in cases where the plaintiff "did not pose a tenable threat to the officers' safety" or "the police did not have an adequate level of suspicion to justify any seizure at all") (collecting cases). A reasonable jury crediting Plaintiffs' version of the facts could find that Sergeant Hart threw Reed to the ground while he was unarmed, non-threatening, and not resisting. Because Reed's right to be free from force when compliant and non-resistant was clearly established at the time of Hart's challenged conduct, we **AFFIRM** the district court's denial of qualified immunity on Reed's excessive force claim.

## III. CONCLUSION

For the aforementioned reasons, we **REVERSE** the denial of qualified immunity as to Officer Evilsizer, **AFFIRM** the denial of qualified immunity as to Sergeant Hart, and **REMAND** for further proceedings consistent with this opinion.